# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ANABEL L. ZAHNER, by her agent RAYMOND E. ZAHNER and the Estate of DONNA C. CLAYPOOLE By MITCHELL R. CLAYPOOL, Executor and CONNIE L. SANNER, by her agent, JAMIE R. RYBAK, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil No. 11-306 Erie |
| BEVERLY MACKERETH in her official Capacity as Secretary of the Commonwealth of Pennsylvania, Department of Public Welfare, | ) ) ) ) ) | |
| Defendant. | ) | |

## *Introduction*

Like many government benefit programs, applicants must meet certain financial requirements to become eligible, a so-called "resource assessment." The three cases before us involve similar issues but with somewhat different factual backgrounds. Financial planners, particularly attorneys, constantly attempt to make their clients eligible for such benefits while at the same time preserving the clients' assets or at least "keeping them in the family." In these cases, each of the Plaintiff applicants attempted to obtain eligibility for Medicaid by several methods, including purchasing annuities, thereby reducing their countable assets, arguing that such reduction now made them eligible for Medicaid assistance. The Pennsylvania Department of Welfare, which administers the Medicaid program, denied the applications holding that the purchase of the annuities was an illegal transfer of assets.

## OPINION

Pending before the Court is Defendant, the Department of Welfare's (hereinafter "DPW" or "Defendant"), Motion for Summary Judgment [ECF No. 38], and Plaintiffs, Anabel L. Zahner's, Donna Claypoole's, and by way of Consolidation,[1] Connie L. Sanner's, (hereinafter "Plaintiffs"), Cross Motion for Summary Judgment [ECF No. 45], pursuant to Rule 56 of the Federal Rules of Civil Procedure and L.R. 56.1 of the Local Civil Rules of the United States District Court for the Western District of Pennsylvania.

On December 9, 2011, Plaintiffs Zahner and Claypoole filed a Complaint in Civil Action [ECF No. 1] seeking declaratory and injunctive relief, as well as attorneys' fees and other "just and appropriate relief." The Complaint alleged that Plaintiffs' purchases of annuities were deemed transfers of assets for less than fair market value by the State despite the fact that the annuities were reported to have met all requirements of the federal Medicaid law. The determination by Defendant caused the Plaintiffs' applications for long-term care Medicaid to suffer a period of ineligibility for Medicaid benefits that is "greater than the law typically provides." Consequently, Defendant's decision, according to Plaintiffs, violates Plaintiffs' rights under Title XIX of the Social Security Act (the "Medicaid Act"), in particular 42 U.S.C. § 1396p(c)(1)(F) and § 1396p(d)(6). [ECF No. 1 at 2].

All parties filed Motions for Summary Judgment claiming there are no genuine issues as to any material fact. Each side asserts that it is entitled to judgment as a matter of law. We agree that there are no genuine issues as to any material fact here. For the reasons set forth below, Defendant's Motion for Summary Judgment will be granted only with regard to the annuities

---

1 Connie L. Sanner commenced action against then Pennsylvania Secretary of the DPW, Alexander, on August 24, 2012 at case 1:12-cv-00201-MBC. Ms. Sanner's case was identical to Zahner's and Claypool's case in the basic facts, applicable law and parties. Therefore, the case of <u>Sanner v. Alexander</u> was joined with this case at issue on December 13, 2012.

purchased by Plaintiffs through Employee's Life Company ("ELCO"), otherwise Defendant's Motion for Summary Judgment will be denied. Plaintiffs' Cross-Motion for Summary Judgment will be granted to the extent it applies to those annuities purchased by the Plaintiffs through MetLife Insurance Investors, USA ("MetLife"), in all other respects Plaintiffs Motion for Summary Judgment will be denied.

## I. Standard of Review.

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The parties must support their position by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). In other words, summary judgment may be granted only if there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).

In reviewing the evidence, the court draws all reasonable inferences in favor of the non-moving party. See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986); Huston v. Procter & Gamble Paper Prod. Corp., 568 F.3d 100, 104 (3d Cir. 2009) (citations omitted). It is not the court's role to weigh the disputed evidence and decide which is more probative, or to make credibility determinations. See Anderson, 477 U.S. at 255; Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004); Boyle v. Cnty. of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998).

"Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 247-48 (1986). An issue is "genuine" if a reasonable jury could possibly hold in the non-movant's favor with regard to that issue. See id. "Where the record taken as a whole could not lead a reasonable trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587; Huston, 568 F.3d at 104.

## II. Relevant Facts.

### *Zahner*

Anable L. Zahner ("Zahner") is 77 years old and at the commencement of this action (December 9, 2011) lived at home in Titusville, Pennsylvania with her husband, Raymond E. Zahner. Mr. Zahner has filed this action as his wife's agent. Mrs. Zahner requires medical assistance to continue to live in the community and wants the Medical Assistance – Long Term Care (MA-LTC) to pay for needed services. On April 18, 2011 Zahner and her husband transferred a remainder interest in their house to their daughter, as Trustee of the Raymond E. and Anabel L. Zahner irrevocable Income-Only trust [ECF No. 46 at 1]. On that same day, Mr. Zahner completed a resource assessment form for his wife. [ECF No. 39 at 2]. The County Assistance Office's analysis of the form showed the countable resources of the couple were $365,871.30. Id. The amount exceeds the countable resources allowable to receive benefits under MA-LTC. Id.

On May 16, 2011 Mr. Zahner loaned his son $80,000 in return for a promissory note providing for repayment of the loan at 5% interest for a period of sixteen months. [ECF No. 46 at 1-2]. On May 26, 2011 Mr. Zahner filed an application for a single premium annuity with

MetLife for $30,000 providing for monthly payments of $507.25 over a five-year term, beginning June 15, 2011. The beneficiary at Mr. Zahner's death for any remaining payments is "Department of Public Welfare of PA to the extent of its interest which is defined as the total amount of Medical Assistance paid on behalf of Anabel L. Zahner." Id. at 2. Once the MetLife annuity was issued the remainder beneficiary was identified as "Name WHICH IS DEFINED AS THE." Id. On October 7, 2011 MetLife, in response to a request, clarified this designation as follows:

"Our records currently reflect the beneficiary designation as: Primary Beneficiary: DEPARTMENT OF PUBLIC WELFARE OF PA TO THE EXTENT OF ITS INTEREST WHICH IS DEFINED AS THE TOTAL AMOUNT OF MEDICAL ASSISTANTCE PAID ON BEHALF OF ANABEL L ZAHNER."

On June 15 and 29, 2011 the Zahners transferred 1621 shares of National Fuel stock, without consideration, to their daughter as Trustee to the trust. [ECF No. 39 at 2; ECF No. 46 at 2].

On July 12, 2011 Mrs. Zahner mailed her application for MA-LTC benefits to the Crawford County Assistance Office. [ECF No. 46 at 3]. The transfers caused a period of ineligibility for MA-LTC benefits for Zahner. [ECF No. 39 at 2]. Also on July 12, 2011 the U.S. Court of Appeals issued a decision upholding the finding of a District Court that loans between a parent and child in the context of a Medicaid application could not be considered trust-like devices. See Sable v. Valez, 437 F. App'x. 73 (3d Cir. 2011). [ECF No. 46 at 3]. On August 15, 2011 Zahner's Medicaid application was denied because of the $80,000 transfer to her son was treated as excess resources to Zahner. Id. Shortly thereafter the loan was returned by their son and on August 18, 2011 Mr. Zahner filed an application for a single premium immediate annuity with ELCO for $75,000 for monthly payments of $4,199.58 over an 18-month term,

beginning September 28, 2011. Id. at 3-4. Defendant asserts this annuity's sole purpose was to provide money to pay for Zahner's home care during her period of ineligibility for MA-LTC. [ECF No. 39 at 3-4]. Zahner's actuarial life expectancy at the time of the two annuity purchases was 9.48 years. [ECF No. 39 at 4].

On the same day the Zahners received the ELCO annuity, they requested reconsideration of Zahner's Medicaid Application. Id. On October 31, 2011, the Crawford County Assistance Office issued a second notice of denial to Zahner on the grounds that she had transferred $237,188.19 (this includes the value of assets transferred such as a remainder interest in Zahner's house and 1,621 shares of National Fuel stock) in assets without receiving fair market value. [ECF No. 1 at 6]. Because the amount stated is $105,000 more than the gifts Zahner reported in her Medicaid application, it is clear that the purchase of annuities ($30,000 + $75,000 = $105,000) were treated as transfers for less than fair market value. Id. Only the penalty period for the transfer of the $105,000 is disputed.

### *Claypoole*

Donna C. Claypoole was 86 years old at the time the Complaint was filed and resided at Clearview Nursing and Rehabilitation Center in Sligo, Pennsylvania. Her husband, Donald Ray Claypoole, who was 84 years old and resided at their home in Emlenton, Pennsylvania, brought this action as Mrs. Claypoole's agent. Mrs. Claypoole died March 13, 2013. The Estate of Donna C. Claypoole ("Claypool") has been substituted as a party to this case [ECF No. 44]. Between May 28, 2009 and November 10, 2010, Mrs. Claypoole and her husband transferred, for no consideration, a total of $110,011 to their sons. [ECF No. 39 at 5; ECF No. 46 at 5]. On August 4, 2011 Mr. Claypoole applied for a single premium immediate annuity with MetLife

Investors for $45,000, providing for monthly payments of $760.20 over a five-year term. Id. The application listed the beneficiary for any remaining payments under the annuity as: "Department of Public Welfare of PA to the extent of its interest which is defined as the total amount of Medical Assistance benefits provided to the institutionalized Donna C. Claypoole." Id. The beneficiary designation on the policy printed the beneficiary as "DEPT. OF PUBLIC WELFARE OF PA FBO DONNA CLAYPOOLE." [ECF No.39 at 6]. By letter dated February 24, 2012, MetLife's records currently reflect the carelessly stated beneficiary designation as follows: "Primary Beneficiary: DEPARTMENT OF PUBLIC WELFARE OF PENNSYLVANIA TO THE EXTENT OF ITS INTEREST WHICH IS DEFINED AS THE TOTAL AMOUNT OF MEDICAL ASSISTANCE BENEFITS WERE [sic] PROVIDED TO THE INSTITUTIONALIZED DONNA CLAYPOOSE [sic]." [ECF No. 46 at 7].

On August 4, 2011, Mrs. Claypoole applied for an $84,974.08 single premium contract labeled "annuity" from ELCO. The contract paid her $6,100.22 for fourteen months. [ECF No. 39 at 6]. Defendant alleges that one purpose of the contract was to pay for nursing home care during her period of ineligibility for MA-LTC benefits caused by asset transfers. Id. On August 29, 2011 Mrs. Claypoole filed her application for MA-LTC with Clarion County Assistance Office. [ECF No. 46 at 6]. (Defendant reports she applied for MA-LTC benefits on August 25, 2011 [ECF No. 39 at 6]). The resource assessment showed that the Claypooles had $370,394.74 in countable resources. Id. Mrs. Claypoole's life expectancy was 6.77 years at the time of the ELCO annuity purchase and 6.06 at the time of the MetLife annuity purchase. Id.

On November 18, 2011 Clarion County Assistance office issued a Notice denying Mrs. Claypoole MA-LTC coverage because she had transferred $262,790 in assets without receiving

fair market value. [ECF No. 46 at 6-7]. Included in this amount were the annuities purchased for $45,000 and $84,784. Id. at 7. Only the portion of the penalty period attributable to the $129,784 used to purchase the MetLife and ELCO contracts is disputed. [ECF No. 39 at 7].

### *Sanner*

Connie Sanner commenced action against then Pennsylvania Secretary of the Department of Welfare, Gary D. Alexander on August 24, 2012 at case 1:12-cv-00201-MBC. The issues in Ms. Sanner's case are identical to Zahner and Claypoole's case in the basic facts, applicable law and parties. Therefore the case of Sanner v. Alexander was joined with this case at issue on December 13, 2012. Connie Sanner ("Sanner") currently resides in a nursing home. Id. at 8. On July 27, 2011 Sanner applied for an immediate annuity with ELCO for $53,700 single premium contact. This contract paid Sanner $4,419.17 over a twelve-month period. [ECF No. 46 at 7]. On August 26, 2011 Sanner transferred $92,000 to her two children for no consideration. Id. On September 1, 2011 Sanner filed her application for MA-LTC with the Venango County Assistance Office. On February 13, 2012 they denied her coverage because she had transferred $152,480.89 in assets without receiving fair market value. Id. at 8. Included in this determination was the fact that various charges on her credit card and the annuity purchase were treated as transfers of assets for less than fair market value. Id. The credit card charges were resolved, however, the treatment of the annuity remained the same. Id. Only the portion of the penalty period attributable to the purchase of the ELCO contract remains in dispute. [ECF No. 39 at 9].

### III. Legal Analysis.

To reiterate what was stated above, summary judgment may be granted only if there

8

exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party. See Anderson, 477 U.S. at 250. Based on the information provided by both parties, we find that there are no material issues of fact which would preclude the entry of summary judgment in this case. Instead the parties seek summary judgment in this case where several different legal (not factual) topics are at issue and all have a bearing on the legality of the purchased annuities and whether the purchased annuities are transfers for less than fair market value causing a penalty waiting period before the Plaintiffs may be eligible for MA-LTC. The legal issues are: Whether the "Granny's Attorney goes to Jail" statute (the lawyers nickname for the statute) is unconstitutional and if it is unconstitutional, is it severable? Whether the MetLife contracts/annuities are assignable and/or are considered trust-like devices? Whether the ELCO contracts/annuities are assignable and/or considered trust-like devices? Does federal law permit a couple to convert resources into community spouse income after the date of institutionalization (this would apply only to the Claypoole's case)? We will address each legal issue in turn below.

A.   **Legal Issues**

### *"Granny's Attorney Goes to Jail"*

Attorneys for the Plaintiffs counseled and assisted them in their financial planning for long-term care coverage. The Commonwealth argues this was illegal under 42 U.S.C. § 1320a-7b(a)(6) ("Criminal penalties for acts involving Federal Health Care Programs"). The statute reads as follows:

(a)   Making or causing to be made false statements or representations

Whoever –

for a fee knowingly and willfully counsels or assists an individual to dispose of assets (including by

9

any transfer in trust) in order for the individual to become eligible for medical assistance under a State plan under subchapter XIX of this chapter, if disposing of the assets results in the imposition of a period of ineligibility for such assistance under section 1396p(c) of this title, shall (i) in the case of such a statement, representation, concealment, failure, or conversion by any person in connection with the furnishing (by that person) of items or services for which payment is or may be made under the program, be guilty of a felony . . . or (ii) in the case of such a statement, representation, concealment, failure, conversion, or provision of counsel or assistance by any other person, be guilty of a misdemeanor . . . In addition, in any case where an individual who is otherwise eligible for assistance under a Federal health care program is convicted of an offense under the preceding provisions of this subsection, the administrator of such program may at its option (notwithstanding any other provision of such program) limit, restrict, or suspend the eligibility of that individual for such period (not exceeding one year) as it deems appropriate; but the imposition of a limitation, restriction, or suspension with respect to the eligibility of any individual under this sentence shall not affect the eligibility of any other person for assistance under the plan, regardless of the relationship between that individual and such other person.

42 U.S.C.A. § 1320a-7b(a)(6) (West)

The Commonwealth argues that this statute makes it a crime if an individual "for a fee knowingly and willfully counsels or assists" in the disposal of assets. [ECF No. 24 at 18]. DPW also proffers that this law is generally ignored. Id. In fact, in 1998 a New York District Court enjoined the enforcement of the statute on First Amendment grounds. See New York State Bar Assc'n v. Reno, 999 F. Supp 710 (N.D.N.Y. 1998). Namely, Attorney General Janet Reno wrote to the presiding officers of both houses of Congress informing them that the Department of Justice would not enforce or defend the constitutionality of the statute because "the counseling prohibition in that provision is plainly unconstitutional under the First Amendment and because the assistance prohibition is not severable from the counseling prohibition." (Letters from Janet Reno to House Speaker Newt Gingrich and Senate President Al Gore, Jr., p. 1 (March 11, 1998).) Magee v. United States, 93 F. Supp. 2d 161, 162 (D.R.I. 2000). Further, there has been no known prosecution enforcing this statute to date. Defense asserts that the counseling portion is

severable from the assisting portion and that this Court could still enforce the statute against Plaintiffs' attorney for assisting in the transfer of the assets.

As a practical matter, the Court agrees with Attorney General Reno in that it would not be feasible to assist a person in transferring assets without the First Amendment right to free speech coming into play in the explanation of the transfer – the so-called counseling. We too cannot envision one without the other. This Court will decline to enforce the statute in this case on the grounds that it clearly appears to be unconstitutional. Therefore, on the issue of criminal sanctions against Plaintiffs' attorney for counseling or assisting Plaintiffs in the transfer of their assets to become eligible for medical assistance, summary judgment will be granted in favor of Plaintiffs. Because the statute is unenforceable on constitutional grounds there is no genuine issue of material fact.

### *MetLife Annuities*

#### *Assignability*

The first issue to be addressed with regard to the MetLife Annuities purchases by Zahner and Claypoole is whether they may be included as countable resources for the Plaintiffs because they are assignable under Pennsylvania law. When the annuity is purchased prior to the date of the resource assessment this conversion has generally been upheld. However, the annuity must be non-assignable or else it can still be considered a resource. Pennsylvania Statute 62 Pa. Stat. Ann. § 441.6 makes all Medicaid annuities assignable unless they comply with certain requirements. In Weatherbee ex rel.Vecchio v. Richman, 595 F. Supp. 2d 607 (W.D. Pa 2009), aff'd 351 F. App'x. 788 (3d. Cir. 2009) District Judge Sean McLaughlin ruled that this statute

conflicted with Federal law because Congress allowed the use of annuities to convert resources into community spouse income, however he did not enjoin the Pennsylvania law.

Furthermore, annuities are countable resources if they can be liquidated without penalty, even if they are exempt from transfer of asset treatment. See generally Morris v. Okla. Dep't of Human Servs., 685 F.3d 925 (10th Cir. 2012); Lopes v. Dep't of Soc. Servs. 696 F.3d 180 (2d Cir. 2012); James v. Richman, 547 F.3d 214 (3d Cir. 2008). If a State allows non-assignment provisions in its annuities, then the annuity will be considered exempt from resource consideration.[2]

Defendant asserts that Pennsylvania law makes all annuities assignable (see Egger v. Gulf Insurance Co., 903 A.2d 1219 (Pa 2006)(The court found that an assignment clause in an insurance policy was valid after the policy-holder had deceased); 62 Pa. Stat. Ann. § 441.6(b)) and, therefore, the MetLife annuities at issue should be considered resources to their owners. However, as stated previously, in Weatherbee it was decided that the Pennsylvania statute conflicts with Federal Law and therefore, the Court chose not to follow the Pennsylvania law. Because of this discrepancy this Court must look more closely at the law covering the annuities.

At issue here is the Medicaid Act (42 U.S.C. § 1396p(c)(1)(F), (G) and § 1396p(e)) as it relates to Pennsylvania Law. By way of the Medicaid Act, Congress chose to regulate the use of annuities:

In order for the purchase of an annuity not to be treated as a transfer of assets for less than fair market value, Congress required that:

---

2 In the case of Flamini v. Velez, (Civil No. 1:12-cv-07304 Dist. of NJ, July 19, 2013), we note that Plaintiff had purchased an annuity that has provisions in it for non-assignability but a catch-all provision that said its compliance with Federal Law is controlling. In this case, an injunction was granted in favor of Plaintiff because of her likelihood to win on this issue. This case is only instructive to our issue at hand and is not contrary to our opinion.

All annuities (whether or not purchased for the Medicaid applicant) name the State as the remainder beneficiary in first position "for at least the total amount of medical assistance paid on behalf of the institutionalized individual" or in second position after the community spouse or minor or disabled child. 42 U.S.C. § 1396p(c)(1)(F); and

Any annuity "purchased by or on behalf of an annuitant who has applied for medical assistance" (other than an IRA annuity) be irrevocable and non-assignable, actuarially sound, and provide for payments in equal amounts during the term of the annuity, with no deferral and no balloon payments made. 42 U.S.C. § 1396p(c)(1)(G).

This law is juxtaposed against Egger and the Pennsylvania law 62 Pa. Stat. Ann.

§ 441.6(b) ("Treatment of life estates, annuities and other contracts in determining medical

assistance eligibility"). The Pennsylvania statute provides:

> (a) As a condition of eligibility for medical assistance, every applicant or recipient who owns a life estate in property with retained rights to revoke, amend or redesignate the remainderman must exercise those rights as directed by the department. The acceptance of medical assistance shall be an assignment by operation of law to the department of any right to revoke, amend or redesignate the remainderman of a life estate in property.
> (b) Any provision in any annuity or other contract for the payment of money owned by an applicant or recipient of medical assistance, or owned by a spouse or other legally responsible relative of such applicant or recipient, that has the effect of limiting the right of such owner to sell, transfer or assign the right to receive payments thereunder or restricts the right to change the designated beneficiary thereunder is void.
> (c) In determining eligibility for medical assistance, there shall be a rebuttable presumption that any annuity or contract to receive money is marketable without undue hardship. (emphasis added)
> (d) Upon approval by the Federal Government of any required State plan amendment implementing this subsection and notwithstanding subsections (b) and (c), a commercial annuity or contract purchased by or for an individual using that individual's assets will not be considered an available resource if the annuity meets all of the following conditions:
> (1) Is an irrevocable guaranteed annuity.
> (2) Guarantees to pay out principal and interest in equal monthly installments with no balloon payment to the individual so that payments are paid out over the actuarial life expectancy of the annuitant, as set forth in life expectancy tables approved by the department.
> (3) Names the department as the residual beneficiary of any funds remaining due under the annuity at time of death of the annuitant, not to exceed the amount of medical assistance expended on the individual during his or her lifetime.
> (4) Is issued by an insurance company licensed and approved to do business in this Commonwealth.
> 62 Pa. Stat. Ann. § 441.6 (West)

In summary, we have Pennsylvania law that determines that all annuities are assignable and Federal law which regulates the assignability of annuities, hence, recognizing that not ALL annuities are assignable. More specifically, Federal Law mandates that an annuity must NOT be assignable else it will be considered part of an applicant's resources in calculating a Medicaid Applicants' assets.

All of the annuities in this case contain anti-assignment provisions, however, the Defendant contends that these anti-assignment provisions are void under Pennsylvania Law, which explicitly confirms the anti-assignment rule with regard to Medicaid annuities. [ECF No. 41 at 33]. Moreover, the Defendant asserts that the McCarran Ferguson Act (15 U.S.C. § 1012(b)) which states, "No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business unless such Act specifically relates to the business of insurance," explicitly preserves to the States the right to regulate insurance products that will be sold within their borders. [ECF No. 41 at 33]. Plaintiffs counter-argue that Egger is not on-point as its main issue was whether an anti-assignment provision was valid post-loss, that Weatherbee pre-empts the Pennsylvania Statute, and that McCarran Ferguson applies to insurance and not investment products such as annuities.

We find the Plaintiffs' arguments on this issue persuasive and agree that the anti-assignment provisions in the annuities at issue are valid. More specifically, while Egger does address the assignability of a policy its main focus is whether the policy had a valid assignment post-loss. The pre- or post-loss issue is not an issue in this case. For purposes of our case Egger simply provides an example of an assignable policy. With regard to the McCarran Ferguson Act

we find this Act, like Egger, to be slightly off-issue. The statute reads:

> (a) State regulation
> The business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business.
> (b) Federal regulation
> No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance: *Provided,* That after June 30, 1948, the Act of July 2, 1890, as amended, known as the Sherman Act, and the Act of October 15, 1914, as amended, known as the Clayton Act, and the Act of September 26, 1914, known as the Federal Trade Commission Act, as amended [15 U.S.C.A. 41 et seq.], shall be applicable to the business of insurance to the extent that such business is not regulated by State law.

15 U.S.C.A. § 1012 (West)

This statute regulates "the business of insurance," and we don't believe that annuities fall into this category. It has long been recognized that annuities are primarily investment products rather than insurance. See Nationsbank of N.C., N.A. v. Variable Annuity Life Ins. Co., 513 U.S. 251, 259 (1995) (quoting D. Shapiro & T. Streiff, annuities 7 (1992), and 1 J. Appleman & J. Appleman, Insurance Law and Practice, § 84, p. 295 (1981)). The Supreme Court developed three criteria for determining if something is "the business of insurance" subject to the McCarran-Ferguson Act. The criteria are: 1) whether the practice transfers or spreads the policy holder's risk; 2) whether the practice is an integral part of the policy relationship between the insurer and the insured; and 3) whether the practice is limited to entities within the insurance industry. See Union Labor Life Ins. Co. v. Pireno, 458 U.S. 119, 120 (1982). In the case of fixed term annuities they fail the criteria to be classified as insurance. First, there is no risk transference involved in an annuity. An annuity is an investment of money with fixed interest payments as opposed to an insurance policy in which the insurance company bears the risk of the

death of the policy holder. Second, a contract for an annuity does create a relationship between the company issuing the annuity and the purchaser of the annuity, however, that relationship is undermined by the fact that an annuity may be assignable. Therefore, it cannot be said that the annuity contract relationship is an "integral" part of the annuity itself. Third, the practice of annuities is not limited to entities within the insurance industry. In fact, Section 441.6(b) regulates the relationship of annuities to the Medicaid Agency. Therefore, the third prong of Pireno fails too. As a result, this Court cannot find that the practice of annuities is not regulated under the McCarran Ferguson Act.

Finally, we turn to the Pre-emption of Pennsylvania law 62 Pa. Stat. Ann. § 441.6(b) by Weatherbee.

> It is a familiar and well-established principle that the Supremacy Clause invalidates state laws that "interfere with, or are contrary to," federal law. U.S. Const. Art. VI, cl. 2. *See Hillsborough County v. Automated Med. Labs., Inc.,* 471 U.S. 707, 712–13, 105 S.Ct. 2371, 85 L.Ed.2d 714 (1985). A conflict between a state and federal law arises when "compliance with both federal and state regulations is a physical impossibility," *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142–43, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963), or when state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581 (1941).
>
> Weatherbee ex rel. Vecchio v. Richman, 595 F. Supp. 2d 607, 617 (W.D. Pa. 2009) aff'd, 351 F. App'x 786 (3d Cir. 2009).

This Court agrees with the conclusion in Weatherbee that Congress' intent was not necessarily to designate all annuities as resources; rather in 42 U.S.C. § 1396p we recognize the intention of Congress to provide an opportunity to purchase annuities that would be sheltered from consideration as part of assets or resources to the purchaser. Furthermore, we find the Federal Statute to be unambiguous in that it provides the ability to make an annuity unassignable,

as well as provides other guidance on the use of annuities in Medicaid scenarios. Therefore, our opinion is in line with <u>Weatherbee</u> in that we do not believe that an annuity payment stream is assignable as a matter of law.

*Remainder designations*

Federal law requires that an annuity name the Department of Public Welfare as remainder beneficiary so the Medicaid program can be repaid if the spouse dies before the annuity has fully paid out. <u>See</u> 42 U.S.C. § 1396p(c)(1)(F). In this case the DPW asserts that the remainder designations in the Plaintiffs' annuities are defective. As mentioned above, Federal law requires that the annuities maintain certain characteristics so that they may not be considered resources for purposes of calculating Medicaid eligibility. One of those requirements is that Medicaid community spouse annuities name the State "as the remainder beneficiary in the first position for at least the total amount of medical assistance paid on behalf of the institutionalized individual." 42 U.S.C. § 1396p(c)(1)(F). Both of the remainder designations in the MetLife Annuities were unclear and not in compliance with the Statute.

The Zahner annuity remainder clause read as follows: "<u>Name</u> WHICH IS DEFINED AS THE." [ECF No. 46 at p.2]. On October 7, 2011 MetLife, in response to a request, clarified this designation as follows: "Our records currently reflect the beneficiary designation as: Primary Beneficiary: DEPARTMENT OF PUBLIC WELFARE OF PA TO THE EXTENT OF ITS INTEREST WHICH IS DEFINED AS THE TOTAL AMOUNT OF MEDICAL ASSISTANTCE PAID ON BEHALF OF ANABEL L ZAHNER." <u>Id</u>. at 4.

The Claypoole beneficiary designation on the policy printed the beneficiary as "DEPT. OF PUBLIC WELFARE OF PA FBO DONNA CLAYPOOLE." [ECF No.39 at 6]. By letter

17

dated February 24, 2012 a MetLife employee represented that MetLife's records currently reflect the beneficiary designation as follows: "Primary Beneficiary: DEPARTMENT OF PUBLIC WELFARE OF PENNSYLVANIA TO THE EXTENT OF ITS INTEREST WHICH IS DEFINED AS THE TOTAL AMOUNT OF MEDICAL ASSISTANCE BENEFITS WERE [sic] PROVIDED TO THE INSTITUTIONALIZED DONNA CLAYPOOSE [sic]." [ECF No. 46 at 7].

The errors in the initial annuity paperwork are clearly typographical in nature and it is evident that MetLife has attempted to cure the mistake that makes the beneficiary designation non-compliant with Federal Law. Defendant argues that to cure the designation the MetLife policy itself provides that the remainder designation may only be modified by "a writing signed by our President, Vice President or Secretary." [ECF No. 41 at p. 39]. If the designation correction remains out of compliance, the Court expects that Plaintiffs will continue to work cooperatively to achieve annuities that are in full compliance with the law. This is not a legal issue for the Court's determination. To deprive the Plaintiffs of Medicaid benefits on the basis of a mere typographical error would be a miscarriage of justice. The Court finds the MetLife annuities to be in compliance with Federal Law and, therefore, not subject to the penalty waiting period for MA-LTC.

### *ELCO Annuities*

Any annuity "purchased by or on behalf of an annuitant who has applied for medical assistance" (other than an IRA annuity) must be irrevocable and non-assignable, actuarially sound, and provide for payments in equal amounts during the term of the annuity, with no deferral and no balloon payments made. 42 U.S.C. § 1396p(c)(1)(G).

*Term of Annuity is too short*

DPW contends that the terms of three of the ELCO annuity contracts in this case are too short to meet the requirements under the statute. Based on their short terms of 18, 14, and 12 months, DPW considers them to be shams and therefore, with regard to Medicaid eligibility their purchase can be penalized and the waiting period for eligibility extended. An annuity is defined by the Centers for Medicare and Medicaid Services (CMS) in Section 3259.1(9.) of the State Medicaid Manual [TRANSMITTAL 64, §3259.1] as "a right to receive fixed, periodic payments, either for life or a term of years." [ECF No. 41 at p. 26]. DPW emphasizes that the requirement specifies a plural term of years. Id. The three ELCO annuities purchased in this case by Zahner, Claypoole and Sanner are for terms of 18 months, 14 months, and 12 months, respectively. Plaintiffs response is that if it was the intent of Congress to mandate a term greater than a year, why wouldn't that be explicit in the language? Rather, Plaintiffs cite to plain language to define "a term of years," such as Black's Law Dictionary (9th Edition, 2009): "Tenancy for a term. A tenancy whose duration is known in years, weeks, or days from the moment of its creation. Also termed tenancy for a period; tenancy for years; term for years; term of years; estate for a term; estate for years; lease for years." [ECF No. 47 at p. 21].

DPW provides further evidence that the ELCO annuities are shams by pointing out that while annuities are considered investments, in the case of Plaintiffs they actually lost money. Id. at 27. The Commonwealth argues that when Congress exempted certain annuities from transfer of asset penalties, it did not envision the kind of sham products used in this case. Defendant says these ELCO transactions have no economic substance other than to create MA-LTC eligibility. Id. at 28. Plaintiffs respond that the purpose for which they purchased the annuities has no

19

bearing on whether they are legal and permitted under the Medicaid system of laws. [ECF No. 47 at p. 22].

We first look to Transmittal 64 to determine Congress' intent in its regulation of annuities.

> Annuities, although usually purchased in order to provide a source of income for retirement, are occasionally used to shelter assets so that individuals purchasing them can become eligible for Medicaid. In order to avoid penalizing annuities validly purchased as part of a retirement plan but to capture those annuities which abusively shelter assets, a determination must be made with regard to the ultimate purpose of the annuity (i.e., whether the purchase of the annuity constitutes a transfer of assets for less than fair market value). If the expected return on the annuity is commensurate with a reasonable life expectancy of the beneficiary, the annuity can be deemed actuarially sound.
> State Medicaid Manual [TRANSMITTAL 64, §3258.9B.]

The Plaintiffs' life expectancies were all greater than the terms of the annuities by a large margin, therefore the annuities may be considered actuarially sound under 42 U.S.C. § 1396p(c)(1)(G)(ii)(l).

Transmittal 64 provides guidance only on the annuities' actuarial soundness. More specifically, it simply states if the beneficiary is expected to live, according to the life expectancy tables in the Transmittal, beyond the life of the annuity the annuity may be deemed actuarially sound and thus not subject to penalty. Transmittal 64 strictly focuses on the actuarial soundness of an annuity for determining whether it may be excepted from penalty. It provides no guidance or comment on the potential penalty waiting period for an annuity that is less than two years in term or for an annuity created with an intent to shelter assets to obtain eligibility for MA-LTC.

A black-letter reading of the law does not provide substantive information on the appropriate duration of an annuity to avoid penalty under the Medicaid law. This being said it is this Court's determination that the underlying intent of Transmittal 64 is to prevent the abuse of Medicaid

funding through estate planning loopholes and to curb the use of annuities created to shelter the assets of people who are otherwise financially situated to cover costs of long-term care. Transmittal 64 does state, "If the expected return on the annuity is commensurate with a reasonable life expectancy of the beneficiary, the annuity can be deemed actuarially sound." It is the opinion of this Court that the word commensurate indicates a reasonable relatedness of the term of the annuity to the beneficiary's life expectancy. In this case the Plaintiffs' life expectancies ranged from six to ten years and the longest ELCO annuity was for a term of 18 months. [ECF NO. 41 at p. 31]. The relation of life expectancy to the annuity term of years does not pass the "sniff-test" for any of the ELCO annuities at issue.

Our position on this issue will not deter the legitimate use of annuities in estate planning or even deter the use of annuities that could potentially have a beneficial end result to a purchaser who is seeking eligibility of MA-LTC without a penalty period. However, so as to legitimize the purchase of an annuity, and so as to avoid situations that frustrate the intent of Transmittal 64, it is our opinion that an annuity must be actuarially sound and the term of the annuity should bear a reasonable relatedness to the beneficiary's life-expectancy (but within the life expectancy of the applicant) to avoid penalty.

The effect of our decision is to cause the annuities that cannot pass scrutiny under a "reasonable relatedness" standard, such as those annuities written by ELCO, to be subject to the penalty waiting period as indicated by the Government. It is our opinion that annuities written in the context of a Medicaid eligibility scenario should be written to satisfy the provisions stipulated in 42 U.S.C. § 1396p, as well as with a scrupulous eye towards achieving a legitimate, non-shelter, purpose or at least have the appearance of such an investment. Having found the ELCO annuities to

be subject to penalty, we may stop our analysis here. However, other unresolved issues in this context should be addressed and therefore, we will move forward with our opinion.

*Trust-like devices because primary purpose is to hold money*

DPW contends that the ELCO annuities may be penalized if they are considered to be "trust-like devices." [ECF No. 41 at p. 29]. Section 1396p(d)(6) states "The term 'trust' includes any legal instrument or device that is similar to a trust but includes an annuity only to such extent and in such manner as the Secretary specifies." Transmittal 64 defines a trust as "any arrangement in which a grantor transfers property to a trustee or trustees with the intention that it be held, managed, or administered by the trustee(s) for the benefit of the grantor or certain designated individuals (beneficiaries). . . The term 'trust' also includes any legal instrument or device that is similar to a trust." Section 3259.1A.1. and 2. Annuities are listed under this section at 9. Therefore, it is evident that the law may view an annuity as a trust-like device.

Transmittal 64 refers us back to the analysis of transfer for less than fair-market value and actuarial soundness of the annuity, which we performed supra. "Under the transfer of assets provisions in § 1917(c) of the Act, as amended by OBRA 1993, you must deny coverage of certain Medicaid services to otherwise eligible institutionalized individuals who transfer (or whose spouses transfer) assets for less than fair market value." Transmittal 64, § 3258.1. "Valuable Consideration means that an individual receives in exchange for his or her right or interest in an asset some act, object, service, or other benefit which has a tangible and/or intrinsic value to the individual that is roughly equivalent to or greater than the value of the transferred asset." Id. at A.2. "Fair market value is an estimate of the value of an asset, if sold at the prevailing price at the time it was actually transferred." Id. at A.1. DPW asserts that it is clear

22

that the ELCO annuities were simply being used to shelter assets because they were transferred for less than fair market value, i.e., they cost more than they would pay out. [ECF No. 41 at 30]. DPW further asserts, as stated in our annuity analysis, that the term of years assigned to the annuity is not commensurate with the reasonable life expectancy of any of the Plaintiffs. Id. at 30-31. Because the analysis under a trust-like evaluation is the same as the annuity evaluation, we come to the same conclusion.

Plaintiffs contest Defendant's interpretation of the annuities as trust-like devices citing to 42 U.S.C. § 1396p(d)(6) which reads: "The term 'trust' includes any legal instrument or devices that is similar to a trust but includes an annuity only to such extent and in such manner as the Secretary specifies." (emphasis added by Plaintiffs). Plaintiffs interpret this to read that an annuity cannot be treated as a trust-like device unless, and only to the extent and in such a manner as, the Secretary of the Department of Health and Human Services (HHS) specifies. [ECF No. 47 at p. 14-15]. To date, the Secretary has not so specified. Id. at 15 n. 13 (citing HHS Lopes Brief, p. 11).

It is the opinion of this Court that Transmittal 64 certainly indicates that an investment such as an annuity has the characteristics of a trust and therefore, according to the Medicaid Manual we have agreement that an annuity can be viewed as a "trust-like device." However, even if we give Plaintiffs the benefit of the doubt that the Secretary has not spoken on the issue, we still find that the purpose of Transmittal 64 is frustrated. Plaintiffs even note in their Brief on Motion for Summary Judgment that Transmittal 64's subjective ultimate purpose inquiry is to determine whether the purchase of an annuity was for retirement planning or "abusive" sheltering of assets. [ECF No. 47 at 17]. Plaintiffs then say that an objective "bright-line" test was

developed to determine if the transfer of assets was for less than fair market value. Id. Hence, the actuarially sound exercise was developed. Id. This Court would be remiss if it determined that fair market value could only be determined by calculating whether an annuity was actuarially sound. We cannot assume that there are no other possibilities for transferring assets for under fair market value other than the term of years of an annuity being less than the expected life of the purchaser. Indeed, the law is constantly developing as new and innovative ideas for asset-sheltering are developing and a determination only considering fair market value would be short sighted.

Therefore, whether or not the Secretary spoke on annuities being considered "trust-like" devices, it is this Court's determination that there is law that indicates they may be considered "trust-like" devices and in the spirit of the annuity analysis, the annuity must pass the "sniff-test" in achieving a legitimate primary purpose and not simply to abusively shelter assets for eligibility for Medicaid.

> *Resources because they are assignable under PA law.*

The Defendant asserts that the ELCO annuities are assignable in the same way it considered the MetLife annuities assignable supra. For the same reasons cited in the case of the MetLife annuities, we find the ELCO annuities to be non-assignable and therefore, compliant with Federal law in this regard. However, our analysis of the ELCO annuities in total finds them non-compliant with Federal law and, therefore, subject to a penalty waiting period.

### *Community Spouse Income after Institutionalization*

There are special rules for determining MA-LTC program eligibility for applicants whose spouse does not require benefits. [ECF 41 at 15]. The first step is for the Department of Public

24

Welfare to determine the income and resources that are protected for the community spouse (the spouse not needing care) and then DPW determines the income and resources available to the spouse seeking MA-LTC benefits. Id. Congress sought to protect community spouses from becoming impoverished, and, at the same time, to bar financially secure couples from sheltering their resources in order to qualify for Medicaid.[3] See Wisconsin Dep't of Health and Family Servs. v. Blumer, 534 U.S. 473, 480 (citing H.R. Rep. No. 100-105, pt. 2, p. 65).

During the first determination of eligibility of an institutionalized individual with a community spouse, both spouses' resources are pooled. The couple's combined resources are considered in this initial eligibility determination and the State deducts the community spouse resource allowance from the pooled resources to determine the initial resources eligibility from the institutionalized spouse. These rules appear in 42 U.S.C. § 1396r-5(c)(2)(A). Upon redetermination of eligibility, the State cannot pool the couple's resources; any resources held in the name of the institutionalized spouse will be counted in determining his or her eligibility. 42 U.S.C. § 1396r-5(c)(4).

The Defendant contends that the purchase of the annuities after institutionalization is contrary to federal law. [ECF No. 41 at 37-38]. DPW argues that the statutory text explicitly supports a dividing line at the time of institutionalization. Namely Section 1396r-5(c)(1)(A) requires that joint resources be computed "as of the beginning of the first continuous period of institutionalization." Id. at 38. Further Section 1396r-5(f)(1) states that "[a]n institutionalized spouse may . . . transfer an amount equal to the community spouse resource allowance to [for the sole benefit of] the community spouse." Id.

Plaintiffs contend that the Federal Law places no limit on the amount of resources that

---

3 Geston v. Anderson, 729 F.3d 1077 (No. 12-2224 (8th Cir. 2012). The issue in this case was whether the income stream from a 13 year $400,000 annuity paying the community spouse benefits of $2,734.65 per monthwas considered part of the couple's total assets. The Circuit Court affirmed the District Court in determining the Department had wrongfully denied Medicaid benefits because it had improperly counted the annuity owned by the community spouse against thespouse seeking MA-LTC eligibility. While this case is instructive, it is not determinative to the issues in our case.

can be transferred to or for the community spouse. [ECF No. 47 at 36]. Plaintiffs do not contest that Section 1396r-5(c)(1)(A) requires the joint resources of a couple be computed "as of the beginning of the first continuous period of institutionalization." What is contested is, after that first determination is rendered, whether Plaintiffs may purchase an annuity (or more generally, redistribute assets) for the benefit of the community spouse that could shelter assets upon redetermination of eligibility. While we understand DPW's concern for potential abuse, we find Plaintiffs argument persuasive in light of the legal support cited in Plaintiffs' Brief in Support of Cross-Motion for Summary Judgment [ECF No. 47]. In particular, the six letters from the Center for Medicare and Medicaid Services (CMS) [ECF 47, Exhibit Nos. 11-16 ] are consistent with one another and CMS does not waiver from its interpretation of the law. Namely, that Section 1917(c)(2)(B) clearly and specifically exempts from penalty transfer from one spouse to another. This Section places no limits on the value of the assets that can be transferred without penalty, nor does it permit states to impose such a penalty. The transfer of assets penalty provision in this section operates as a limit on the applicant's initial eligibility for certain services by requiring a State to consider assets transferred during a specified period *prior* to the application for medical assistance.

Section 1924(f)(1) of the Act does not supersede or conflict with Section 1917(c)(2)(B). Section 1924(f)(1) protects the institutionalized spouse to the extent that his or her resources at the time of the initial application for eligibility (including resources pooled with the community spouse) are above the resource standard, by deducting an amount up to the Community Spouse Resource Allowance (CSRA) before determining the resource eligibility of the institutionalized spouse. This Section requires that the resources set aside for the community spouse are made "as

soon as practicable after the date of the initial determination of eligibility." The outcome prevents the institutionalized spouse from being rendered ineligible based on ownership of resources that should be protected for the community spouse. It also provides for the prevention of impoverishment of the community spouse. Therefore, these types of transfers should not be considered transfers for less than fair market value subjecting the purchaser to penalty.

Section 3258.11 of Transmittal 64 supports the CMS determinations. Section 1924 of the Act "provides for apportioning income and resources between the institutional spouse and the community spouse so that the community spouse does not become impoverished because the individual is in a medical institution." Transmittal 64 further states, "When transfers between spouses are involved, the unlimited transfer exception should have little effect on the eligibility determination, primarily because resources belonging to both spouses are combined in determining eligibility for the institutionalized spouse. Thus, recourses transferred to a community spouse are still [to] be considered available to the institutionalized spouse for eligibility purposes." Id.

Therefore, it is our conclusion that a transfer of assets or a purchase of an annuity after the date in which a spouse is institutionalized will not *per se* be considered a transfer for less than fair market value and prohibited by Federal Law. In such a situation, the annuity should be analyzed to determine whether it has the qualities of a legitimate estate planning investment or whether it has the hallmarks of an illegitimate asset-shelter scheme.

**IV. Conclusion.**

Because there are no genuine issues as to material facts, Defendant's Motion for Summary Judgment will be granted only with regard to the annuities purchased by Plaintiffs

through ELCO, otherwise Defendant's Motion for Summary Judgment will be denied. Plaintiffs' Motion for Summary Judgment will be granted to the extent it applies to those annuities purchased by the Plaintiffs through MetLife, in all other respects Plaintiffs Motion for Summary Judgment will be denied. Further, Summary Judgment is granted in favor of Plaintiffs in that sanctions will not be imposed under 42 U.S.C. § 1320a-7b(a)(6) ("Criminal penalties for acts involving Federal Health Care Programs").

An appropriate Order follows.


January 16th, 2014

Maurice B. Cohill, Jr.
Maurice B. Cohill, Jr.
Senior District Court Judge